The Wayne Public Safety Association, Appellant,
v. The Public Service Commission, and Wayne
Steam Heat Company.

Argued May 1, 1928.

Before Porter, P. J., Henderson, Trexler, Keller, Linn, Gawthrop and Cunningham, JJ.

*Benjamin H. Ludlow,* of *Powell, Ludlow & Schaeffer,* for appellant, cited: Kittanning Telephone Company

v. The Public Service Commission, 77 Pa. Superior Ct. 86; Re: Point Pleasant Natural Gas Company, P. U. R., Anno., 1927-B 805.

T. *Truxton Hare,* and with him *John H. Minds,* for intervening appellee.

*John Fox Weiss,* Counsel, and with him *E. Everett Mather, Jr.,* and *Wendell Y. Blanning,* Assistant Counsel, for The Public Service Commission, cited: State ex rel. Seattle v. Public Service Commission, 180 Pac. 913; State ex rel. Northern 'P. R. Co. v. Pub. Serv. Comm., 95 Wash. 376; Red River Power Co., P. U. R. 1923-E, 534.

OPINION BY CUNNINGHAM, J., July 12, 1928:

The proceeding before the Public Service Comission was a complaint by the Wayne Public Safety Association, filed June 13, 1925, alleging that certain increases in rates, per thousand pounds of steam consumed, made by the Wayne Steam Heat Company in a new tariff filed May 15, effective June 15, 1925, were unjust and unreasonable. After five hearings before the Commission, beginning July 21, 1925, and ending May 6, 1927, its report and order were filed dismissing the complaint. This appeal by the complaining association, in which the respondent company was permitted to intervene as one of the appellees, followed.

The question involved is whether the Wayne Steam Heat Company has, by its testimony, met the burden imposed upon it by Section 4 of Article V of the Public Service Company Law of July 26, 1913, P. L. 1374, which provides that "at any such hearing involving any proposed increase in any rate, the burden of proof to show that such increased rate is just and reasonable shall be upon the public service company." The material facts appearing from the record are that a steam heating system for the rendition of service

to the public in Wayne and St. Davids was installed as early as 1890 and the Wayne Electric Light and Steam Heat Company was incorporated to render this service by means of live steam under high pressure. In September, 1913, the Wayne Electric Light and Steam Heat Company sold to a new Pennsylvania corporation, Wayne Steam Heat Company, intervening appellee herein, its distribution system, including steam mains, service pipes, meters, connections and supplies, and a few days later conveyed to Counties Gas and Electric Company its franchises and generating plant, including several tracts of land, a boiler house (containing six boilers), and its coal and plant material on hand. Both of these vendee corporations are subsidiaries of the United Gas Improvement Company. For a short time after the acquisition of the boiler plant by Counties Gas and Electric Company it continued to generate live steam therein which it sold to Wayne Steam Heat Company for distribution through the latter's system. At the same time Counties Gas and Electric Company was operating a non-condensing electric generating station at its adjacent plant with no available use for its exhaust steam. In order that this exhaust steam might be utilized for heating purposes the old boiler plant, installed by Wayne Electric Light and Steam Heat Company, was abandoned and the above mentioned boilers scrapped and sold. For the purpose of properly distributing this exhaust steam under its lower pressure a considerable part of the distribution system of Wayne Steam Heat Company was replaced with pipes of a larger size. During the ensuing ten years the exhaust steam of Counties Gas and Electric Company was purchased by Wayne Steam Heat Company and distributed to its consumers. In 1923 Counties Gas and Electric Company, in order to meet its increased demand for electric energy, completed a new electric generating plant at Barbadoes Island, opposite Norris-

town, at which electric energy could be produced more economically than at its Wayne generating station. In 1925 Counties Gas and Electric Company discontinued the generation of electric energy at its Wayne plant and began the production of live steam for sale to and distribution by Wayne Steam Heat Company. Averring that the increased cost of generating live steam over the cost of utilizing exhaust steam necessitated an increase in its rates, respondent filed the tariff now complained against. Its previous tariff had been in effect since 1917 and the complainant alleged, inter alia, that "the proposed increases in rates are not warranted by reason of any material increase in the cost of doing business" over the costs incurred in 1917. After the filing of the complaint, but prior to the decision of the Commission, the generating plant was sold by Counties Gas and Electric Company to respondent.

During the earlier stages of the hearing some evidence was introduced relative to the reproduction cost, as of July 1, 1925, less observed depreciation, of respondent's property used and useful in its steam heating service, and an estimate was attempted of the operating costs for the steam heat season of 1925-1926 and the revenue which would be produced by the increased rates during that season. These estimates are of slight importance in the disposition of this appeal because the respondent company, during the progress of the hearings before the Commission, had a full year's actual experience under the new rates and presented to the Commission, as its Exhibit No. 17, the results of that experience for the year ending August 31, 1926. This exhibit discloses that the total cost of producing and distributing the steam sold during that year was $70,060.80, of which $60,975.86 were incurred by Counties Gas and Electric Company in producing the steam and $9,084.94 by Wayne Steam Heat Company in distributing it. No items are in-

cluded in this statement for depreciation or for a return upon the fair value of the property devoted to the public service. On the other hand the total revenue received under the increased rates for all steam sold during that year was only $68,223.31. The result of the year's operations as shown by the exhibit was an excess in operating expenses over operating revenue of $1,837.49. If the Commission was justified in accepting these figures it necessarily follows that no complaint could possibly be sustained against rates which do not even produce sufficient revenue to meet the cost of producing and distributing the steam—to say nothing of such matters as the annual depreciation of the property and a fair return upon its value for rate making purposes. This exhibit was presented at the hearing of January 12, 1927, and its accuracy testified to by J. Henderson Smith, an accountant with the United Gas Improvement Company, who had supervision over the keeping of the accounts of both subsidiary companies. He testified that he prepared the statement from an examination of the books of Wayne Steam Heat Company and Counties Gas and Electric Company; that the boiler plant producing the steam was owned during the period covered by the statement by Counties Gas and Electric Company and all the expenses of operating it, with the exception of $304.31, were paid by that company; that all the expenses of distribution, including taxes, were paid by and shown upon the books of Wayne Steam Heat Company; that the boiler plant was not operated during the period for any purpose other than the production of live steam; and that the steam production expenses shown in the statement "included solely the operation of the plant for the purpose of producing steam for the Wayne Steam Heat Company." By the testimony of this witness and another called at the same hearing it was shown that no electric energy had been generated at the Wayne plant during the

year preceding the hearing and that the generating engines had been sold for junk and taken out. The exhibit was prepared according to the "Uniform Classification of Accounts for Steam Heating Companies," prescribed by the Commission; the operating expenses under the heading "Steam Production" were distributed under twelve items, "Superintendence," "Boiler Labor," "Fuel," "Boiler Expenses," etc., and the operating expenses under the headings of "Distribution," "Commercial," "General," and "Taxes," were divided into fourteen items. Upon the admission in evidence of this exhibit the learned counsel for appellant reserved, with the consent of the sitting commissioner, "the right to cross examine the witness for the company as to how some of these items may be made up." An examination of the record fails to disclose any testimony attacking the accuracy of the figures contained in the exhibit. At one of the earlier hearings some criticism was suggested of respondent's policy in purchasing coal under contracts instead of buying "spot" coal and of its failure to show in detail the quality of coal purchased and the prices paid, but no direct attack was made upon the prices paid during the period covered by the exhibit. The exhibit is entitled "Combined Statement of Operations—Steam" and it is argued vigorously in behalf of appellant that as both the producing and the distributing company are owned and controlled by a parent company the arrangement for the sale of steam from one to the other should be regarded with suspicion in so far as the interests of the consumers are concerned; that an unusually heavy burden rests upon respondent to establish by competent evidence that the arrangement is just and reasonable.

If the distributing company had submitted a statement of operating expenses, containing an item showing merely the price it had paid to the producing company for steam, there might have been some ground

for appellant's suggestion. This, however, was not done. It submitted as a part of its exhibit a comprehensive statement of the cost to the producing company of generating the steam and this cost, without any allowance for depreciation or return upon the generating plant, was the amount charged to the distributing company for the steam. There is direct testimony that there was no inter-company profit in the transaction. The evidence was clearly competent for the purpose offered and an examination of the exhibit does not disclose that respondent has charged for the year covered by it any items which should have been distributed over a term of years, as was sought to be done in Kittanning Tel. Co. v. Public Service Commission, 77 Pa. Superior Ct. 86. In that case the appellant endeavored to justify an increase in rates upon the ground of increased operating expenses, but the testimony showed an item of more than eleven thousand dollars, the cost of changing a pole line, the total amount of which was included in the expenses for the year under consideration. This court there held that, as the evidence was insufficient to analyze and distribute this item, the operating expenses for that year could not be determined with accuracy, and added, "the consequences of that however remain with appellant for the statute placed the burden of proof upon it."

In Schuylkill Railway Co. v. Public Service Commission and Lehigh Valley Railroad Co., 71 Pa. Superior Ct. 204, (a case in which it was alleged that the order of the Commission was based upon incompetent evidence), President Judge ORLADY, speaking for this court, said: "There is no statutory designation either of the kind or quality of the evidence required to induce a decision by the Public Service Commission, and it would be impractical to specifically define the quantity necessary to produce that result. It must be sufficient, however, to satisfy a reason-

able mind that the fact is as alleged. The law vests in that body the authority to exercise its judgment, and it is that, rather than the opinion of this court, which is to control the subject, if the order be within the power of the Commission, and it is not unreasonable."

It is clear from an examination of this record that the rates of respondent from 1917 to 1925 were based upon the purchase of exhaust steam as a sort of by-product incident to the generation of electric energy, whereas its rates under the tariff complained against are based upon the use of live steam produced for heating purposes alone, the entire cost of which is now placed upon the approximately two hundred and thirty steam heat consumers. The burden was on the respondent to satisfy the Commission that it needed additional income to meet the alleged increased cost of producing the steam. "No presumption exists with respect to any question of fact" in favor of respondent: Bay State Rate Case, P. U. R. 1916-F 221. In general terms the burden it is required to meet is that the evidence offered be sufficient in quantity and quality to satisfy a reasonable mind that the facts are as alleged. We are of opinion that the respondent has, under all the circumstances of this case, sufficiently met the burden of proof imposed upon it. The gravamen of the complaint seems to be that, because Counties Gas and Electric Company and Wayne Steam Heat Company are both owned by the United Gas Improvement Company and the changes in plant operation to which we have referred have resulted in lower rates for electric energy and higher rates for steam heat service, the increased cost of producing steam should not all be placed upon steam heat consumers. Referring to the change from the use of exhaust to live steam in 1925, the Commission, in disposing of this contention, said: "Prior to this change the utility was forced to decide whether it would continue to provide its local service in the old manner, benefiting

one group of consumers by maintaining existing conditions, or make the change tending to greater economy in the one service but thereby increasing the cost of rendering the other. Whichever decision it might make, one group of consumers would feel aggrieved. In the light of all the facts before the Commission, it cannot be found that the utility's decision was unreasonable, or that the consumers of the electric service could reasonably or legally be required to bear a part of the cost of serving respondent's steam heat patrons."

The disposition of this phase of the controversy was peculiarly within the exercise of the discretion vested in the Commission as an administrative body and we are not persuaded that there is anything unreasonable in its conclusions. We find nothing in any of the fifteen assignments of error requiring a reversal of the order of the Commission.

The order is affirmed.